141 So. 195

**PATTERSON v. STATE.**

**8 Div. 320.**

Supreme Court of Alabama.

March 24, 1932.

Rehearing Denied April 9, 1932.

George W. Chamlee, Sr., and George W. Chamlee, Jr., both of Chattanooga, Tenn., and Joseph R. Brodsky, Irving Schwab, Allan Taub, Elias M. Schwartzbart, Joseph Tauber, and Sidney Schreiber, all of New York City, for appellant.

534

Thos. E. Knight, Jr., Atty. Gen., and Thomas Seay Lawson, Asst. Atty. Gen., for the State.

**BROWN, J.**

The appellant was indicted, tried, and convicted of the offense of rape.

◼ No question was raised on the trial as to the sufficiency of the indictment, which is in the form prescribed by the statute, and under the uniform decisions of this court was sufficient to advise the defendant of the nature and cause of the accusation he was called upon to answer. Code 1923, § 4556, form 88; Myers et al. v. State, 84 Ala. 11, 4 So. 291; McQuirk v. State, 84 Ala. 436, 4 So. 775, 5 Am. St. Rep. 381; Schwartz v. State, 37 Ala. 460; Malloy v. State, 209 Ala. 219, 96 So. 57; Doss v. State, 220 Ala. 30, 123 So. 231, 68 A. L. R. 712.

We cannot, on the record before us, affirm error in the action of the circuit court on appellant's petition for change of venue. The only evidence offered in support of the petition was the oath of the movants; the articles appearing in the three newspapers; the testimony of Wann, the sheriff of the county, and Major Starnes, who was in command of the military company. This falls far short of showing to the reasonable satisfaction of the judicial mind an all-pervading prejudice against the accused in the county of the trial that would prevent him from obtaining a fair and impartial jury for his trial.

◼ The accused and his alleged accomplices, who swore to the petition for change of venue, were confined in jail and were not in a position to ascertain the state of the general public feeling and sentiment of the county, and, as was observed in Hawes v. State, 88 Ala. 37, 54, 7 So. 302, their testimony is entitled to very little weight.

The publications in the local paper, the Sentinel, were not inflammatory, and contained no undue assumption of the guilt of the accused, and "nothing appears to have been stated for the purpose of arousing indignation, or tending to create prejudice, except in so far as the publication of the facts and circumstances of the murders as they were developed might have had that effect; and in stating the facts there appears to have been no disposition to suppress whatever was favorable to defendant." Hawes v. State, 88 Ala. 54, 7 So. 302, 307.

In fact, these publications were in a sense conciliatory, apparently designed to suppress rather than create an unlawful hostile sentiment against the accused.

■ As to the publications appearing in the Montgomery Advertiser and the Chattanooga paper, there was no evidence showing to what extent, if any, said papers were circulated in the county from which the jurors were to be drawn, and in the absence of such proof these publications were entitled to little or no weight. Malloy v. State, 209 Ala. 219, 96 So. 57.

The testimony of the witnesses Wann and Starnes, the only witnesses examined who were in a position to ascertain and know the nature of public feeling, goes to show that no threats or hostile demonstrations were expressed or made against the defendant; that the crowds that gathered were not disorderly, and readily dispersed when advised by some of the leading citizens of Scottsboro to do so, and there is nothing in the evidence going to show race prejudice against the accused, or local prejudice in favor of the girls who are alleged to have been mistreated. In fact, neither the defendant nor his alleged victims reside in Jackson county.

In short, the evidence shows nothing more than the gathering of a crowd impelled by curiosity, and not for hostile or punitive purposes.

■ True, the evidence shows that the sheriff requested the Governor to send a company of the state militia to protect the defendant, and that prompt orders to this end were given and carried out, and that they were present during the proceedings; but this, without more, is not enough to authorize the granting of the motion.

■ We are, therefore, impelled to hold that the appellant has failed to sustain the allegations of his motion by sufficient evidence, and that the petition was denied without error. Godau v. State, 179 Ala. 27, 60 So. 908; Seams v. State, 84 Ala. 410, 4 So. 521; Jones v. State, 181 Ala. 68, 61 So. 434; Williams v. State, 147 Ala. 10, 41 So. 992.

The facts going to show hostile demonstrations and threats toward the prisoner in Thompson v. State, 117 Ala. 67, 23 So. 676, do not appear in the report of that case, but the record in that case shows that threats of lynching were made, and that a hostile crowd gathered with the purpose of following the sheriff and his prisoner to Huntsville where he was carried for safety, for the purpose of taking the prisoner from the sheriff, and followed as far as Greenbrier, where they met with providential hindrances that caused them to forego their purpose. Moreover, the person abused in that case was a mere child and a resident of Decatur, the county seat of the county where the trial was had.

■ The only question raised on the trial as to the venire of jurors from which the jury to try the defendant was selected is stated in the bill of exceptions as follows: "Before proceeding to strike the jury in this case, defendant demanded a special venire, in addition to the regular venire, for the trial of this case. The court declined to allow a special venire for this case and required the defendant to strike a jury from the regular venire drawn for the week and the special venire drawn in the case of The State of Alabama v. Charley Weems and Clarence Norris, to which action of the court in not allowing him a special venire in this case, and requiring him to select a jury from the regular venire and the special venire drawn in the case of the State v. Charley Weems and Clarence Norris, defendant duly and legally reserved an exception."

The case of this appellant, which was numbered 2404 in the circuit court, was argued and submitted on this appeal along with the case of Charley Weems and Clarence Norris, which was a joint indictment against this appellant, Charley Weems, Clarence Norris, and others, numbered 2402 in the circuit court, and the record in this case, as well as the record in the other case, shows that all of the defendants, including appellant, were duly arraigned on March 31, 1931, in cases numbered 2402 and 2404; that they interposed a plea of not guilty, and both of said cases were set for trial on April 6, 1931; that the court ordered that the jury, to try the cases so set, should consist of one hundred jurors, composed of the regular venire of jurors drawn for the week beginning April 6th, consisting of seventy-five, and twenty-five special jurors, then drawn from the jury box of the county in the presence of the defendant and his counsel, and the sheriff was ordered to summon all of said jurors to be present on the date set for the trial, and to serve each of the defendants with a list of the jurors so drawn and ordered summoned, together with a copy of the indictment, and that said order was duly executed by such service by the sheriff, on April 4, 1931. The venire of jurors so drawn and summoned constituted the special venire for defendant's trial, and was in

strict compliance with the statute. Code of 1923, §§ 8644, 8649.

The section of the Code last above cited, section 8649, provides: "Whenever the judge of any court trying capital felonies shall deem it proper to set two or more capital cases for trial on the same day, said judge may draw and have summoned one jury or one venire facias of petit jurors for the trial of all such cases so set for trial on the same day."

Prior to the enactment of this statute the law required a special venire for each case, whether it was set for trial along with other capital cases or not. Walker v. State, 153 Ala. 31, 45 So. 640; Adams v. State, 133 Ala. 166, 31 So. 851; Cawley v. State, 133 Ala. 128, 32 So. 227; Rambo v. State, 134 Ala. 71, 32 So. 650.

But the quoted statute changed this rule as applied to cases set for trial on the same day. Umble v. State, 207 Ala. 508, 93 So. 531; Stewart v. State, 18 Ala. App. 92, 89 So. 391.

The contention, therefore, of the appellant, that he was entitled to a special venire other than the special venire so drawn and constituted, is without merit.

█ The state's witness, Victoria Price, the person alleged to have been raped, on cross-examination by the defendant's counsel, testified, inter alia, "I have been married; I have been married twice. Both of my husbands are not now living; one of them is dead." Defendant's counsel thereupon asked the witness: "Are you divorced?" This question was objected to by the solicitor, and the court sustained the objection, and properly so, because the question clearly called for immaterial evidence.

█ This witness was also asked on cross-examination: "Did you ever practice prostitution?" Objection to this question was likewise well sustained. There was no evidence at this time in the case, and, as for that matter, no such evidence was adduced on the trial, going to show that the defendant had intercourse with the witness by and with her consent; therefore, the question elicited immaterial evidence. Griffin v. State, 155 Ala. 88, 46 So. 481; Rice v. State of Florida, 35 Fla. 236, 17 So. 286, 48 Am. St. Rep. 245; Story v. State, 178 Ala. 98, 59 So. 480; 22 R. C. L. 1208, § 42.

█ Previous chastity is not an essential element of the offense charged in the indictment, and, where this is so, rape may be committed on an unchaste woman, or even a common prostitute. Bailey v. Commonwealth, 82 Va. 107, 3 Am. St. Rep. 87; 22 R. C. L. 1175, § 5.

█ For like reasons the objection of the solicitor to the question, "Do you know whether or not these girls had a venereal disease?" was properly sustained. Moreover, to have pursued the investigation proposed by this question would have engendered an unprofitable multiplication of the issues. Southern Railway Co. v. Plott, 131 Ala. 312, 31 So. 33.

The remaining questions relate to the order of the court denying the motion for a new trial.

This invites a review: (1) Of the evidence and its sufficiency to support the verdict; (2) of the proceedings on the trial for errors alleged to have been committed prejudicial to the defendant; and (3) whether or not evidence alleged to have been discovered since the trial is such as requires that a new trial be granted. These questions will be treated in the order stated.

The evidence without dispute proves the corpus delicti, that is, that Victoria Price was torcibly ravished, and the single litigated question was whether or not the defendant was one of the persons guilty of the offense—a question of identity.

The evidence shows that the said Victoria Price, a white woman twenty-one years of age, on the occasion was riding on a fast freight train running between Chattanooga, Tenn., and Huntsville, Ala., in a gondola car partly laden with chert or gravel, with her girl companion, Ruby Bates, white, age seventeen years; that there were seven white boys in the same car. The girls were garbed in overalls; that twelve boys of the negro race attacked the white boys and forced all of them, except one Gilley, the smallest of the white boys, off the train while it was in motion, and then using force stripped the girls of their outer garments, and six of the negroes ravished Victoria Price and six ravished the other girl. The state witnesses identified the defendant as one of the ravishers of Victoria Price. The evidence further shows that, when the train was stopped at Paint Rock, by the deputy sheriff and the posse comitatus, the alleged victim, Victoria Price, was in a state of exhaustion, requiring immediate medical attention; that when the two young women were examined on the afternoon of the same day by Dr. Bridges, a physician at Scottsboro, to quote from his testimony: "I found their vaginas were loaded with male semen, and the young girl was probably a little more used than the other, the other not showing as much. On the body were bruises on the lower part of the groin on each side of Ruby Bates, that is the young one, and there was a bruised spot around the hips, or the lower part of the back, on the other girl, the Price girl, a few scratches, small scratches on the hands and arms, and a blue spot here (indicating) on the neck of

one of them. I think that was Mrs. Price, I will not be sure about that."

The defendant's contention is, and he offered some testimony to sustain this contention, that, while he was on the train he did not go on the car where the girls were, and did not participate in the affray with the white boys, but remained on another part of the train. This was the substance of his own testimony. He testified, however, that one of the white boys walked by where he was before the fight and almost pushed him off the train, and some words passed between him and said white boys.

Roy Wright, one of the defendant's companions traveling with him, who was not on trial, and who was not convicted on his subsequent trial, as was stated in argument at the bar, was offered as a witness by defendant, and testified: "My name is Roy Wright. I know this boy that just left the stand. I was on the train with him. I have a brother here that was on the train. He works in Chattanooga for the Lookout Furniture Company. My mother works there and has been working there a pretty good while. I am fourteen years old. I got on the train with this defendant at Chattanooga. Gene Williams, Andy Wright, the defendant and I all left Chattanooga together. We were intending to go to Memphis. This boy (defendant) did not have anything to do with those girls on that train. He was not down in the car with those girls; he was standing up on top of a box car. I saw a pistol. A long, tall, black fellow with duck overalls on; that is the only pistol I saw. This boy (defendant) did not have a knife. He did not open his mouth to the girls. I saw the girls on the train. They were on an oil car when I saw them. There were nine negroes down there with the girls and all had intercourse with them. I saw all of them have intercourse with them. I saw all of them have intercourse; I saw that with my own eyes. The defendant was not down there; he was never down there with the girls. The boys I left Chattanooga with were named Haywood Patterson, Eugene Williams and Andy Wright."

On cross-examination the witness testified:

"I first saw the girls on the oil tank; that was up in Chattanooga before we left the yards. I was by myself when I saw the girls. They caught the oil tank in front of the car Haywood Patterson, Andy Wright and Eugene Williams were on and I caught a box car and walked over the box car and passed by that car the girls were in and walked on down to the oil car where they were. The girls were not in the gondola car then, but were in the oil car. I walked along the oil car until got to where these boys were. When I got down there, I found three boys there. The others were away up further; I did not see the other boys until we got to Stevenson.

"The girls rode the oil car down to Stevenson and then got off that car and got in this gondola, and then we boys got on the car together. There were fourteen colored boys on the car together. I had seen the girls in the gondola. I did not tell the fourteen boys the girls were on the train; I did not tell them anything. I saw the girls myself. I do not know whether the other boys saw them, too. We met the other boys in Stevenson. We did not talk about the girls. I did not hear someone say, 'Let's go down there.' The way it was, those white boys, when we were laying back on the oil car, kept walking backward and forward across it and liked to have knocked the defendant off. When we left out of Stevenson coming this way, we were on a cross-tie car; we had gotten off the oil car. This cross-tie car was about three cars from the gondola these girls were in. We started on the cross-tie car from Stevenson. There were fourteen in the car when we started from Stevenson, all of us in the same car. There was nothing said about the girls being down in the gondola; we were talking about men. We knew that the men were down there too. They had been passing by and we had a few little words. Haywood Patterson, Eugene Williams, Andy Wright and I were on the oil car and the white boys kept walking backward and forward and liked to have knocked Haywood Patterson off and Haywood said: 'How come you did not ask me to move,' and so the white man said: 'What do you care?' and Haywood said: 'I care a lot, I don't want to be knocked off,' and the white man said: 'We will settle it when the train stops.' It was the white boy that said that. He was on the train and he went up and got some more white boys and then the train stopped in Stevenson and they got off and went up in the gondola. The boys all got off and went up in the gondola. The white girls went up there with them, I guess, or they were up there. The negroes all got on a cross-tie car and stayed there. I was on the cross-tie car, all fourteen of us on the cross-tie car. The cross-tie car was not the next car to the gondola, but was three cars from it. We all got on the cross-tie car. After the train started off, the first one of the white men came over, the one that had on a big, black belt, and we were telling the other boys about it, that they were intending to put us off, that is that the white boys were intending to put us off, but we over-powered them and put them off; that occurred down in the gondola. We all made it up among ourselves to put them off; we made it up while we were over there on the cross-tie car, and after we all had made it up among ourselves to go over and put the white boys off, we all came along

the cross-tie car and got over the box car and jumped down in the gondola. I did not put any of the white boys off, but the little boy and I saved the life of one of them. They were intending to put him off and every time his feet would hit, it would throw him in between the cars, and we took pity on him and told him we would let him alone, and they reached down and pulled him back up and he got on the gondola and Haywood, Eugene and Andy went back over the top and left the rest in there, and I was sitting up on the box car, together with Patterson. He and I were on one box car and Eugene and Andy on the other one. I was sitting there looking in on the gondola, but Andy, Haywood and Eugene were not. Haywood was sitting as far as that man (indicating) from me and the others were back on the other box car. Andy went down in the gondola when they were putting the men off; it was not at Paint Rock, but right after the train left Stevenson; that is not Andy Patterson sitting right there (indicating); his name is Haywood Patterson. We all went down in there when we went to put off the men. Patterson went down there with us; all four of us went down in there to put them off. I was in the gondola when I told them not to throw him off but to bring him back.

"The long, tall, black fellow had the pistol. He is not here. I saw none of those here with a pistol. I saw five of these men here rape the girl. After we put the men off, we went back on the box car and I was sitting up on the box car holding to that wheel, looking down at them. I did not tell the officers I saw everyone rape her but me. I did not tell them that. I did not tell them that I saw the defendant rape her. I did not see the defendant rape the Bates girl. I did not see him do anything except he just helped put off the men. He was putting them off because they kept stepping across him and talking about putting us off. I saw one knife down in there. That boy back there (indicating) had it, Eugene; he is the one that had the knife. I did not see him hold it on the throat of that girl. He did not have hold of her throat, because he was sitting up on the box car. I saw one down in the gondola, a little white-handle knife. Clarence Norris had that knife; I do not know where he got it; I do not know what he did with it. He had it the last time I know anything about it. I am sure the defendant did not do anything."

Some of defendant's other witnesses testified that the defendant was in the gondola car and participated in the affray with the white boys, but that he did not participate in the commission of the rape. This testimony tends to show a conspiracy between those who went into the car and forced the white boys from the train, and that this appellant aided and abetted in the commission of the offense. 22 R. C. L. 1176, § 6; State v. Burns, 82 Conn. 213, 77 A. 1083, 16 Ann. Cas. 465; State ex rel. Attorney General v. Tally, Judge, 102 Ala. 25, 15 So. 722.

It is settled law that an order refusing a new trial on the ground that the evidence is not sufficient to support the verdict, or that the verdict is contrary to the evidence, will not be disturbed, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it is wrong and unjust. Cobb v. Malone & Collins, 92 Ala. 630, 9 So. 738.

Prior to the enactment of the statute authorizing review on appeals of rulings on motions for new trials, such rulings were not reviewable, and the statute as first enacted applied only to civil actions at law. After its construction and application in the case cited and numerous decisions reaffirming the rule of that case, the statute was amended by the Act of September 22, 1915, p. 722, making it applicable to appeals in criminal cases, and since that amendment the rule announced in Cobb v. Malone & Collins, supra, has been repeatedly reaffirmed. Dees v. Lindsey Mill Co., 210 Ala. 183, 97 So. 647; Hatfield v. Riley, 199 Ala. 388, 74 So. 380; Price v. Price, 199 Ala. 433, 74 So. 381. And the same rule is applicable to criminal cases. Caldwell v. State, 203 Ala. 412, 84 So. 272.

Applying this rule we are not able to affirm that the verdict of the jury is contrary to the weight of the evidence. On the contrary, the verdict is amply supported by the evidence.

We have heretofore treated all exceptions reserved during the trial, and have found nothing to warrant a reversal or justify the granting of a new trial.

But the appellant insists that he was prejudiced by the applause of the people in the courtroom when the jury, in another case involving the same transaction and other defendants, returned into court with a verdict of guilty and recommending the death penalty, and the court should have ex mero motu declared a mistrial and continued the case.

The only recital in the bill of exceptions which purports to give a full history of the trial is, after the examination of the first witness for the state was concluded, "thereupon the following occurred: The Court: I think the jury is ready to report; Sheriff; take this jury into the jury room while the other jury reports. Thereupon the jury retired to the jury room." Following this another state witness was called and the trial proceeded. There is no recital of any disturbance or applause; nor was any question raised in respect thereto.

The motion for a new trial alleges that when the jury reported in the case of State

v. Weems, and Norris, after the jury in this case had been carried to the jury room and the door closed, but to which the transom was partly open, the spectators in the courtroom burst into applause, and this applause spread to persons on the streets around the courthouse, and that some were heard to exclaim "Whoopee." And offered evidence aliunde, consisting of the ex parte affidavits of the defendant and others, and the testimony of witnesses given ore tenus, some of which tended to prove these averments.

The purpose of the statute which allows a bill of exceptions is to bring into the record all matters, not a part of the record proper, for the purposes of the appeal, that the court may have before it a history of the case, in so far as it is necessary to the questions presented for review, and all matters occurring during the trial in the presence of the court of which the court might take notice, must be stated in the body of the bill in the order of their occurrence, and to be reviewable on appeal, the general rule is that some action of the court must be invoked in respect thereto. Hendry v. State, 215 Ala. 635, 112 So. 212; Dempsey v. State, 15 Ala. App. 199, 72 So. 773; Decatur Water Works Co. v. Foster, 161 Ala. 176. 49 So. 759; Sovereign Camp, W. O. W. v. Gay, 20 Ala. App. 650, 104 So. 895.

It is not permissible to inject such matters—occurrences during the trial in the presence of the court—by evidence aliunde on the hearing of the motion for a new trial, for the all-sufficient reason that such practice would inject into such hearing a controversy in respect to which the court might be advised by his own personal observation, leading to the conclusion that the issue was without merit. Hopkins v. Commonwealth, 210 Ky. 378, 275 S. W. 881.

We therefore hold that this matter is not presented, and error in denying the motion for a new trial cannot be affirmed on this ground.

It is also urged that there was some commotion on the streets when the jury reported in the Weems and Norris Case, and that there was a band parade playing popular tunes such as "There'll Be A Hot Time In The Old Town Tonight." The evidence goes to show, in fact is without dispute, that the parade was put on by the Ford Motor Company in demonstrating Ford trucks, and had no connection with the proceedings in this case against the defendant; that the noise was made by a graphophone with an amplifier to attract the people in Scottsboro to inspect the caravan of Ford trucks, brought into Scottsboro by the "Ford people" in no way connected with that county, except they had an agency there. The only other music was by the hosiery mill band playing for the guard mount of the militia after 6 o'clock in the evening.

The evidence as to the extent of the commotion or applause in the street was in conflict, and the evidence fails to show that it was such as to reach the ears of the jury, which was then confined in the jury room in the courthouse.

There was, therefore, nothing in these matters to put the court in error for refusing a new trial.

No question was raised on the trial as to the constituent element of the venire from which the jury was selected, except as heretofore treated, and there is nothing in the statutes regulating the selection of persons qualified to serve as jurors, or in the interpretation of said statutes by the courts that in any way discriminates against any citizen as to his right to serve as a juror; nor does the evidence show any such discrimination in this case. Code of 1923, § 8603; Acts 1931, p. 59; Thomas v. State of Texas, 212 U. S. 278, 29 S. Ct. 393, 53 L. Ed. 512; Ragland v. State, 187 Ala. 5, 65 So. 776.

The remaining ground to be considered relates to the question of newly discovered evidence, and, as heretofore stated, there is nothing in the evidence, or the circumstances which any of the evidence tends to prove, going to show that the accused had sexual intercourse with the witness Victoria Price, by or with her consent, express or implied.

On the contrary, the evidence shows that she was forcibly ravished, and the defendant's sole contention is that he was not present in the car at the time the offense was committed, and did not aid or abet those who participated in the crime. In these circumstances evidence going to show specific acts of sexual intercourse between the alleged victim and other men, and her general reputation for chastity, was not material as going to show consent. Rice v. State of Florida, 35 Fla. 236, 17 So. 286, 48 Am. St. Rep. 245; Griffin v. State, 155 Ala. 88, 46 So. 481; 22 R. C. L. 1175, § 5; McQuirk v. State, 84 Ala. 435, 4 So. 775, 5 Am. St. Rep. 381.

It is the settled law of this state, which is in accord with the weight of authority, that newly discovered evidence which goes merely to the credibility of witnesses examined on the trial is not such as authorizes the granting of a new trial. Fries v. Acme White Lead & Color Works, 201 Ala. 613, 79 So. 45; Southern Railway Co. v. Wildman, Adm'r, 119 Ala. 565, 24 So. 764; Vanderburg v. W. W. Campbell, 64 Miss. 89, 8 So. 206; Goodwin v. Aaron, 203 Ala. 677, 85 So. 17; Harrell v. Gondolf, 6 La. App. 50; Doiron v. Baker-Wakefield Cypress Co., 131 La. 618, 59 So. 1010.

The motion for new trial was therefore denied without error.

No reversible error appearing in the record and proceedings of the trial, the judgment of conviction is due to be affirmed. It is so ordered.

Affirmed.

GARDNER, THOMAS, BOULDIN, FOSTER, and KNIGHT, JJ., concur.

ANDERSON, C. J., dissents.